**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                      )
600 LB GORILLAS, INC.,                                )
                                                      )
                Plaintiff,                            )        CIVIL ACTION
                                                      )
        v.                                            )        Case No. 15-CV-13991-ADB
                                                      )
FIELDBROOK FOODS CORP. and                            )        Jury Trial Demanded
MISTER COOKIE FACE, LLC,                              )
                                                      )
                Defendants,                           )
_____              )

**DEFENDANTS' MOTION FOR A DIRECTED VERDICT**

Defendants Fieldbrook Foods Corp. ("FFC") and Mister Cookie Face, LLC ("MCF")
hereby move, pursuant to Fed. R. Civ. P. 50(a), for a directed verdict on all counts of the Second
Amended Complaint brought by the Plaintiff 600 lb Gorillas, Inc. ("Gorillas"). Based on the
evidence presented at trial, a reasonable jury would not have a legally sufficient evidentiary basis
to find in favor of Gorillas on any of its claims.

Gorillas has asserted nine claims: (1) breach of contract against FFC (Count I); (2) breach
of contract against MCF (Count II); (3) breach of the covenant of good faith and fair dealing
against FFC (Count III); (4) breach of the covenant of good faith and fair dealing against MCF
(Count IV); (5) negligent misrepresentation against FFC (Count V); (6) negligent
misrepresentation against MCF (Count VI); (7) breach of fiduciary duty against FFC (Count VII);
(8) violation of M.G.L. c. 93A against FFC (Count VIII); and (9) violation of M.G.L. c. 93A

1

against MCF (count IX). Additionally, Gorillas includes a count for "alter ego/veil piercing" (Count X) seeking to hold each of FFC and MCF liable for any actionable conduct of the other.[1]

**Argument**

A.   **GORILLAS' BREACH OF CONTRACT CLAIM, AND CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AGAINST FFC MUST FAIL WHERE GORILLAS HAS ADMITTED IT HAD A CONTRACT ONLY WITH MCF.**

Chris White testified that Gorillas entered into a verbal agreement with MCF before MCF was acquired by FFC. (Trial Tr. 7/31/18, 139:4-7.) He admitted that Gorillas never negotiated a new contract with FFC after the acquisition. (Id., 139:8-12.) Additionally, Gorillas stipulated that the relevant business relationship was between Gorillas and MCF. (Exhibit 673, ¶ 11: "The way the business relationship worked between Mister Cookie Face, Inc., and 600 lb Gorillas..."; see also ¶ 20: "MCF and Gorillas orally agreed that MCF would manufacture ice cream to specifications…") In these circumstances, no reasonable jury could conclude that Gorillas had a contract with FFC. As such, the Court should enter a directed verdict in favor of FFC on Gorillas' claim of breach of contract against FFC.  Also, since there is no contractual relationship between FFC and Gorillas, the Court should also direct a verdict for FFC on the claim for breach of the implied covenant of good faith and fair dealing.  *See Levenson v. L.M.I. Realty Corp.*, 31 Mass. App. Ct. 127, 131 (1991) (dismissing claim of breach of the implied covenant of good faith and fair dealing as there is no contract of which such a covenant can be part).

---

[1] Piercing the veil is not a separate cause of action, but rather a "means of imposing liability on an underlying cause of action such as a tort or breach of contract." *Kraft Power Corp. v. Merrill*, 464 Mass. 145, 149 (2013), *citing* 1 W.M. Fletcher, Fletcher Cyclopedia of the Law of Corporations § 41.10 (rev. ed. 2006).

**B.**     **GORILLAS FAILED TO ESTABLISH THAT ANY CONDUCT OF THE DEFENDANTS CAUSED ITS DAMAGES, WHICH INSTEAD FLOWED FROM ITS UNRELATED LOSS OF BJ'S AS A CUSTOMER.**

Causation is an essential element of every one of Gorillas' claims. Therefore, in order to prevail on any of its claims, Gorillas must prove by a preponderance of the evidence that some act or omission of FFC or MCF caused Gorillas to suffer damages (under Counts I-VII) or injury (under Counts VIII and IX). By the time Gorillas rested its case, it had presented no evidence sufficient for the jury to find that any breach of contract, breach of the covenant of good faith, negligent misrepresentation, breach of fiduciary duty, or unfair or deceptive act, was the proximate cause of any damage or injury to Gorillas.

On the contrary, the evidence is clear that while the net income of Gorillas' business may have declined during the period of the parties' dispute, this decline had nothing to do with any conduct of FFC or MCF. In fact, Gorillas had been steadily losing money since 2011, a trend that continued into the 2014-2016 period for which it claims damages. (Exhibit 242; Trial Tr. 8/1/18, 124:16-141:15.) Gorillas actually lost *less* money in 2014 and 2015 than it did in 2013, before any alleged quality issues. (*Id.*) Moreover, the evidence shows that beyond this consistent decline (beginning well before any relationship between Gorillas and the Defendants) the final blow to Gorillas' business was the loss of its largest customer, BJ's Wholesale Club ("BJ's").

Even well before Gorillas lost BJ's business, Chris White had acknowledged in an e-mail dated October 23, 2015: "If we lose this business [BJ's] it would most likely put us [Gorillas] out of business and cause serious issues for us financially." (Exhibit 565.) Similarly, on February 12, 2016, after being told by BJ's frozen foods buyer, Jim Niquette, that BJ's would no longer be carrying Gorillas' product and was switching to a Nestle product, Mrs. White emailed Mr. Niquette and stated: "I'm sure you are aware, from the many emails and vociemails that I've left, that this

is <u>devastating news for me and the welfare of our company</u>" (emphasis added) (Exhibit 384.) Paula White testified at trial that Gorillas was "not able to survive being dropped, being discontinued at BJ's." (Trial Tr. Day 8/2/18, 119:10-12.) She testified that the loss was "financially devastating" because "BJ's was over 80 percent of our revenue." (Trial Tr. 8/2/18, 119:15-16.) Chris White testified that Gorillas' "business was completely destroyed by losing the BJ's business." (Trial Tr. 7/31/18, 98:19-22.)

Gorillas also did not present any evidence that BJ's stopped carrying its product for reasons having anything to do with quality. In fact, the evidence was that BJ's moved to a similar Nestlé product because of better pricing. (Trial Tr. 8/1/18, 89:3-92:19; 8/2/18, 202:18-203:4.) Mrs. White said she thought Nestlé had intentionally developed a similar product, and priced it aggressively, in order to push Gorillas out of the marketplace. (Trial Tr. 8/3/18, 4:10-16, 15:16-21.) Nestlé also offered BJ's "an intense demo and marketing program that Gorillas couldn't match." (Trial Tr. 8/3/18, 15:11-15; Exhibit 555.) Mrs. White believed Nestlé was taking a loss on the product in an effort to "crush" its competitor, which is "common in a business like Gorillas was in." (Trial Tr. 8/3/18, 4:18-5:2, 7:2-5.)

Mrs. White acknowledged that BJ's "ultimately was going to make the decision on what products to carry that were in the best interests" of BJ's. (Trial Tr. 8/3/18, 12:22-25.) That decision was not based on any suggestion of poor quality, or issues with Gorillas' product being out of stock. (Trial Tr. 8/3/18, 9:4-8.) It was based on Nestlé's having offered a similar product, with better pricing, coupled with "an intense demo and marketing program that Gorillas couldn't match." (Trial Tr. 8/3/18, 15:11-15.) While unfortunate for Gorillas, these circumstances had nothing to do with any conduct of the Defendants, and Gorillas presented no evidence to the contrary.

Gorillas was also not able to identify any other customer that allegedly stopped buying its product because of issues with its quality. While Mrs. White initially testified that Costco stopped buying after its buyer tried an "icy" sample, on cross-examination it became clear that the same buyer actually ordered 8,000 units of Gorillas' 12-pack boxes for Costco shortly thereafter. (Trial Tr. 8/2/18, 132:5-8, 145:1-2; Exhibit 668.) And another Costco buyer bought 17,500 units of Gorillas ice cream sandwiches in 2015. (Trial Tr. 8/2/18, 198:23-199:5.)

Thus the focus is squarely on the loss of BJ's, which represented over 80% of Gorillas' business, and which loss simply was not caused by the Defendants. Where causation is an essential element of every one of Gorillas' claims, there is no basis on which a reasonable jury could find FFC or MCF liable under any of those claims. As such, the Court should enter a directed verdict for FFC and MCF on each claim.

## C.   **GORILLAS CANNOT RECOVER LOST PROFITS WHERE IT HAD NO PROFITS FOR THE THREE YEARS LEADING UP TO THE DEFENDANTS' ALLEGED CONDUCT.**

Gorillas seeks damages in the form of lost profits under two alternative assumptions: (1) that BJ's would have stopped buying Gorillas' product irrespective of any quality issues, and (2) that BJ's would have continued buying Gorillas' product. Alternatively, Gorillas seeks to recover the alleged equity value of its business as of December 31, 2013, which is calculated based on the assumption that Gorillas would have been profitable moving forward (i.e. 10% expected revenue growth for 2014-2018).

Even if a causal connection could be shown between FFC or MCF's conduct and Gorillas' lost sales, Gorillas is not entitled to recover any amount of prospective lost profits where the evidence shows that it had no history of profits during any period relevant to this dispute. In fact, Gorillas' financial records show that it had no net profits (negative net income) for at least *three*

*full years*, 2011, 2012 and 2013, before it claims to have received consumer complaints about its product in 2014. (Exhibit 242; Trial Tr. 8/1/18, 124:16-141:15.) Any alleged "lost profits" from 2014 onward are entirely consistent with Gorillas' prior operating history. In fact, it is not at all clear that Gorillas' alleged lost sales, if they had not been lost, would have translated to higher profits. From 2012 to 2013, Gorillas' sales *went up* by $247,257.64, but its net profits *decreased* from negative $87,167.06 to negative $112,537.52. (Exhibit 242.) In any case, Gorillas had negative net profits for every year from 2011 onward. It is elementary that Gorillas cannot have lost profits if it was not earning profits.

"[T]o show that it lost profits, [Plaintiff] must first show that it was previously earning profits." *Metropolitan Exp. Services, Inc. v. City of Kansas City*, Mo., 71 F.3d 273, 275 (8th Cir. 1996). *See also Brevard County Fafr Assoc., Inc. v. Cocoa Expo, Inc.*, 832 So.2d 147, 153 (Fla. App. 2002) ("a condition precedent to recovery is proof by competent substantial evidence that the business has earned profits for a reasonable time before the occurrence of the wrong"); *Crowell Corp. v. Himont USA, Inc.*, 1994 WL 762663, *3 (Del.Super.Ct. Dec.8, 1994) (a party can only recover for lost profits where "there is concrete data of past profit history"); *Empire Shoe Co. v. NICO Indus., Inc.*, 398 S.E.2d 440, 443 (Ga. App. 1990) (a party may recover lost profits "only if the business has a proven 'track record' of profitability"); *T.D.S., Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1532 n. 14 (11th Cir. 1985) (trial court properly refused jury instruction on lost profits where plaintiff showed no history of profitability for reasonable time prior to breach of contract sued upon); *Benvenuti Oil Co. v. Foss Consultants Inc.*, 2006 WL 328678, *14 (Conn.Sup.Ct. June 25, 2006) ("failure to show profit must have some bearing on the ability to earn future profits"); *Northwest Mining and Extraction Co. v. Safe Guard Products*, 112 Wash.App. 1045, *7 (2002) ("'The usual method of proving lost profits is from profit history"); *SK Hand Tool Corp. v. Dresse1*

*Ind., Inc.*, 672 N.E.2d 341, 348 (Ill.App. 1996) ("a business which has not been profitable generally will be unable to provide competent proof by which the profits can be estimated with reasonable certainty'').

Absent extraordinary circumstances that would have turned Gorillas' financial track record around, it is reasonable to infer that it would have continued to perform in 2014 as it had in the prior years. No evidence of any such circumstances was presented at trial. Thus, no reasonable jury could find that Gorillas would have had positive net income in 2014-2016 but for FFC's or MCF's conduct. As such, the jury has no basis to award prospective lost profits to Gorillas. To the extent that Gorillas seeks damages in the form of lost profits (including its alleged loss of equity value, which is based on anticipated profits) the Court should enter a directed verdict for FFC and MCF.

**D.      GORILLAS HAS NOT ESTABLISHED ANY AMOUNT OF DAMAGES WITH A REASONABLE DEGREE OF CERTAINTY.**

In *Augat, Inc. v. Aegis, Inc.*, the SJC stated the "principle of law that should guide the court" in assessing the recoverability of lost profits as follows:

> Prospective profits may be recovered in an appropriate action when the loss of them appears to have been the direct result of the wrong complained of and when they are capable of proof to a reasonable degree of certainty. They need not be susceptible of calculation with mathematical exactness, provided there is a sufficient foundation for a rational conclusion. . . . But such damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty. The nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts. When the elements, upon which the claim for prospective profits rests, are numerous and shifting contingencies whose relation to the wrong complained of is problematical, and such profits are not provable with assurance as a trustworthy result of the alleged cause, then there can be no recovery. Manifest ambiguities in ascertaining what would have been the course of events in the face of complicated factors, under circumstances which never have come to pass, and inherent difficulties in calculating the amount of prospective gains, prevent the recovery of damages.

*Augat, Inc. v. Aegis, Inc.*, 417 Mass. 484, 488 n. 4 (1994), *quoting Lowrie v. Castle*, 225 Mass. 37, 51 (1916) (emphasis added).

In calculating Gorillas' alleged damages, Gorillas' financial expert witness, Joseph McKneely, began by assuming that FFC's and MCF's conduct caused Gorillas to lose sales, then speculated about what damages might have resulted if that were true. As discussed above, there was no evidence that the quality of Gorillas' product had anything to do with its lost sales. In light of Gorillas' lack of evidence of causation, Mr. McKneely's conclusions about the profits that Gorillas would have lost *if the Defendants' conduct had caused it to lose profits* is "remote, speculative, hypothetical, and not within the realm of reasonable certainty." *Augat, Inc. v. Aegis, Inc.*, 417 Mass. at 488, *quoting Lowrie*, 225 Mass. at 51. However, even if there were evidence linking FFC's and MCF's conduct to Goriallas' lost profits, Mr. McKneely's lost profits analysis is impermissibly speculative in its own right.

The fact that Mr. McKneely provides three different amounts of lost profits based on several different scenarios—ranging from $790,000 to $3.9 million—itself highlights that there is no knowing what amount Gorillas might have lost if FFC and MCF had caused it to lose business. The $3.9 million number is apparently based on a valuation of Gorillas' business before the alleged wrongdoing, on the assumption that FFC's and MCF's conduct caused Gorillas to lose the entire value of its business. This is pure speculation. First of all, the analysis assumes that Gorillas would have continued operating and growing its business from 2014 through 2017. But the evidence was that BJ's would have dropped Gorillas in February 2016 in any event, and Mr. White admitted that losing BJ's "would most likely put us out of business." (*See* Exhibits 3-4.) Additionally, the valuation is for the entire business, including aspects that Gorillas acknowledges FFC and MCF had nothing to do with, for instance its cookie dough product. Obviously any alleged conduct of

the Defendants cannot have impacted that product line. A business valuation that so flagrantly ignores reality cannot satisfy the *Augat* analysis.

Moreover, after Gorillas lost BJ's business in February 2016, Gorillas stopped selling ice cream sandwiches and cookie dough in July 2016. Gorillas actually canceled an August 3, 2016 meeting scheduled with BJ's frozen foods buyer that might have allowed Gorillas to regain this business. (Exhibit 559.) Thus, the premise that any conduct of FFC and MCF, even if it caused Gorillas to lose sales, caused Gorillas to lose the entire value of its business is speculative and unsupported. It is at least as likely that Gorillas' damages were caused by its own failure to mitigate, and not any conduct of FFC or MCF. Indeed, after losing BJ's in February of 2016, Gorillas only attempted to sell to four new potential customers—despite identifying double that number of "target" customers in an investor presentation. (Trial Tr. 8/1/18, 114:21-115:5, 117:5-25; Exhibit 672(a).) Finally, Gorillas claims that it canceled the August 3, 2016 meeting with BJ's because by that time it did not have the financial resources to re-launch its product there. (Trial Tr. 8/3/18, 76:10-17.) However this ignores the fact that Gorillas had a guaranteed line of credit in the amount of $400,000 which it could have drawn upon. (Exhibit 672(b).) Instead, Gorillas chose to go into hibernation. (Trial Tr. 8/1/18, 118:10-14.)

Mr. McKneely acknowledges this by calculating, in the alternative, the amount of business Gorillas would have lost if it had continued operating and BJ's had continued buying its product. This scenario is purely conjectural and irrelevant to this case, because as discussed above, Mr. Niquette's communications with Gorillas establish unequivocally that the decision to drop Gorillas had nothing to do with the quality of its product—and thus nothing to do with FFC or MCF. As Gorillas admits, Nestlé offered BJ's better pricing and a marketing and demo program that Gorillas could not match. (Exhibit 554, 556; Trial Tr. 8/3/18, 15:11-15, 18:21-24).) Furthermore, Paula

White admitted that the "cost of ingredients and doing business in general made it so that [Gorillas] could no longer run profitably." (Exhibit 200.)

Finally, Mr. McKneely calculated Gorillas' lost profits in a realistic scenario—where BJ's stopped carrying Gorillas' product for reasons unrelated to quality, as the evidence shows actually occurred. However, Mr. McKneely's lost profits analysis in this scenario was flawed as well. Mr. McKneely assumed an unsupported 10% annual growth rate throughout the period of the estimate (2014 through 2017) despite the fact that Gorillas' ice cream sales had actually declined between 2008 and 2013 on a compound annual basis. He also used Gorillas' total company sales to estimate lost profits, although the only product at issue in this case was the ice cream sandwich; he ignored Gorillas' voluntary cessation of operations in July 2016; and he failed to account for early payment discounts that Gorillas offered to its customers. As such, even Mr. McKneely's third scenario is based on counterfactual assumptions and unfounded speculation.

"When, as in the instant case, a plaintiff claims lost profits damages, the evidence must establish the amount of lost profits 'with sufficient certainty.'" *Cahill v. TIG Premier Ins. Co.*, 47 F. Supp. 2d 87, 89 (D. Mass. 1999), *quoting Augat*, 417 Mass. at 488. Here, Gorillas is not even sufficiently certain what outcome would have occurred if not for the conduct it seeks redress for— would its business have continued at a less profitable level without its largest customer, or would BJ's have continued buying Gorillas' product despite Mr. Niquette's communications to the contrary?

Additionally, in seeking to recover its entire equity value or its entire hypothetical profits, Gorillas fails to account for sales it lost due to other issues, such as problems with the cookie produced by Ellison Bakery. Chris White stated in an e-mail that Gorillas had "really lost a lot of customers between Fieldbrook selling us bad ice cream and the 1183 cookie." (Exhibit 427.)

Where Gorillas cannot establish what damages are attributable to alleged conduct of FFC and/or MCF, as opposed to other causes such as the cookie, Gorillas has failed to establish damages with the certainty that the law requires. *Augat, Inc. v. Aegis, Inc.*, 417 Mass. 484, 488 (1994) ("Many factors bear on the financial performance of a company. The plaintiffs had to show the portion of Isotronics's losses, at least in general terms, that was attributable to the defendants' misconduct."); *United States Football League v. National Football League*, 842 F.2d 1335, 1377-78 (2d Cir. 1988) (upholding instruction "that the jury could award no damages or one dollar in damages if they found that they could not 'separate out the amount of losses caused by [NFL misconduct] from the amount caused by other factors, including perfectly lawful competitive acts and including business decisions made by the [USFL] or the [USFL's] own management.'"); *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1361 (Fed. Cir. 2005) (where record shows multiple causes of plaintiff's loss of business, plaintiff must demonstrate the amount of damages attributable to [defendant] with reasonable certainty.")

Gorillas' damages analysis falls far short of establishing lost profits with the requisite certainty. This is a case in which "[m]anifest ambiguities in ascertaining what would have been the course of events in the face of complicated factors, under circumstances which never have come to pass, and inherent difficulties in calculating the amount of prospective gains, prevent the recovery of damages." *Lowrie*, 225 Mass. at 52. As such, the Court should enter a directed verdict for FFC and MCF.

**E.      GORILLAS CANNOT ESTABLISH A FIDUCIARY DUTY GIVEN ITS OWN LEVEL OF SOPHISTICATION, AND WITHOUT A FIDUCIARY DUTY THERE CAN BE NO BREACH THEREOF AND NO NEGLIGENT MISREPRESENTATION BY OMISSION.**

Chris and Paula White operated Gorillas for fifteen years before the alleged quality issues leading to this lawsuit. (Trial Tr. 7/30/18, 25:19-20.) They personally developed the frozen cookie

dough that was Gorillas' original product. (Id. 27:5-17.) Gorillas started selling ice cream sandwiches in 2008, and Mr. and Mrs. White tested and approved the original ice cream mix created by United Dairy. (Id. 30:20-22, 42:8-14.) The Whites provided the recipe for the cookie to be used in their original ice cream sandwich, and worked with Ellison Bakery and their original co-packer Rhino Foods on the formulation. (Id. 43:20-25.) Mr. White demonstrated an intimate understanding of each stage of the process, from combining ingredients into the ice cream mix to pasteurization, freezing, placement between the cookies, hardening, wrapping, packing and shipment. (Id. 44:22-45:20, 70:8-21.) Once production of the ice cream sandwiches moved to MCF, Mr. White was involved in detailed discussions about developing and adjusting both the mix and cookie formulas. (Trial Tr. 7/30/18, 117:15-20, 137:3-9, 138:15-139:7, 141:6-19; 7/31/18, 7:11-14; 8/1/18, 147:24-148:10.) He worked closely with Ellison Bakery on changing the cookie formulation to work on MCF's automated line, and coordinated the switch to the automated line with MCF. (Trial Tr. 7/31/18, 173:3-13; Exhibits 458, 470, 486, 535.) He also visited MCF "many times" to view the production process. (Trial Tr. 7/30/18, 70:8-21; 140:1-8; Trial Tr. 7/31/18, 31:2-4, 30:19-31:6, 67:7-13, 155:18-20.) He was in close contact with MCF personnel regarding production issues and, ultimately, Gorillas' quality concerns. (Exhibits 20, 78, 81, 110.) Gorillas also reviewed and approved all aspects of its product's packaging and labeling, and was responsible for shipping and distribution. (Trial Tr. 7/30/18, 48:2-20; 8/1/18, 171:19-172:1.) It cannot plausibly be argued that Gorillas was an unsophisticated party whose lack of knowledge the Defendants could have readily taken advantage of in their dealings.

As noted by Gorillas, in considering whether a fiduciary duty has arisen in a business relationship, the trier of fact should "consider the relation of the parties, the plaintiff's business capacity contrasted with that of the defendant, and the 'readiness of the plaintiff to follow the

defendant's guidance in complicated transactions wherein the defendant has specialized knowledge.'" (Gorillas Letter Brief, ECF 272, *citing Smith v. Dorchester Real Estate, Inc.*, 732 F.3d 51, 63 (1st Cir. 2013), *quoting Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1stCir. 1995).) The same case also holds that "trust and confidence reposed in a party possessing a great disparity of knowledge or expertise ..., while ordinarily not enough standing alone to give rise to fiduciary obligations, may produce such obligations if the trust and confidence is knowingly betrayed by that party for the purpose of securing some benefit to itself." *Smith*, 732 F.3d at 63, *quoting Geo. Knight & Co. v. Watson Wyatt & Co.*, 170 F.3d 210, 216 (1st Cir.1999). The court there focused on the "vastly disproportionate knowledge" of the parties, noting that the plaintiff did not even know what transaction he was entering into. *Id.* ("Smith did not even know that he was purchasing two properties, let alone that he was obligating himself to repay nearly $850,000. Indeed, Century 21 agents and their cohorts kept Smith entirely blind as to the nature of the purported investments.") The plaintiff was assured that the defendants would "take care of everything," while in fact they entered fraudulent transactions on his behalf.  *Id.* at 63-64.

The present case bears no resemblance to *Smith*, or to other cases where a breach of fiduciary duty is found in a business transaction. *See Sequoia*, 44 F.3d at 44 (no fiduciary duty despite district court's finding that defendant "'managed' the entire transaction"). There was no "vastly disproportionate knowledge." There was no understanding that FFC or MCF would "take care of everything." Rather, Mr. White was deeply involved, hands-on, in MCF's manufacturing process and the investigation into the quality concerns Gorillas had raised.

Moreover, there is no evidence that FFC or MCF abused whatever relationship they had with Gorillas to secure some benefit to themselves. All that they arguably gained from Gorillas was its continued placement of orders—for which Gorillas in any event refused to pay in full. *See*

*Sequoia*, 44 F.3d at 45 ("The effect of the judgment below will not be to remedy unjust enrichment or, for that matter, any other benefit accruing to Sequoia. Sequoia would simply be paying again for the same parts it had already purchased from Moog."); *compare Smith*, 732 F.3d at 64 (defendants collected commissions from fraudulent transactions in plaintiff's name);

If FFC had no fiduciary duty to Gorillas, it also cannot be liable for negligent misrepresentation by virtue of any failure to disclose information to Gorillas. That is, any negligent misrepresentation claim must be based on <u>affirmative</u> misrepresentations. This is because Massachusetts "has long adhered to the 'rule of nonliability for bare nondisclosure,'" except in the following limited circumstances: (1) where there is a statutory duty to disclose, as for example a duty to disclose material information in the sale of securities; (2) where there is a fiduciary relationship; and (3) where the omission renders an otherwise accurate statement misleading. *In re Access Cardiosystems, Inc.*, 404 B.R. 593, 643 (Bankr. D. Mass. 2009), *aff'd*, 488 B.R. 1 (D. Mass. 2012), *quoting Kannavos v. Annino*, 356 Mass. 42, 247 N.E.2d 708, 711 (1969).

Gorillas did not present evidence of any affirmative misrepresentation, or any otherwise accurate statement that was rendered misleading by particular information being omitted from it. There is plainly no statutory duty in this case. Gorillas' evidence focused on FFC and/or MCF's alleged failure to provide information to Gorillas, such as certain test results and information about the maintenance of MCF's Lactoscope. However, without a fiduciary duty, this evidence (even if credited) cannot support a finding of negligent misrepresentation under the law.

Additionally, ***Gorillas presented no evidence that it relied on any alleged misrepresentation or omission***, which is an essential element of its negligent misrepresentation claim. *Nycal Corporation v. Peat Marwick LLP*, 426 Mass. 491, 496 (1998). In fact, Mr. White testified that by March 2015—despite MCF's suggestions that Gorillas' consumer complaints were

primarily caused by issues with the cookie—*he had concluded that the problem was the ice cream*, not the cookie. (Trial Tr. 7/30/18, 114:20-115:3.) And he stated in an e-mail dated September 1, 2015 that *regardless of any test results that MCF had obtained*, "we have a very serious issue with our product that needs to be addressed." (Exhibit 218.) Indeed, *by that time, Gorillas has obtained the test results of two outside labs it had engaged, Deibel and UL*, each of which set forth numbers that were out of specification, and which Gorillas relied on then and is relying on at trial. Thus Gorillas *cannot* argue that it relied on any absence of test results that the Defendants allegedly failed to provide to it. Gorillas had done its own outside testing and had long since drawn its own conclusions and acted on them.

Because there was no evidence of circumstances that would support a fiduciary duty among the parties, the Court should enter a directed verdict for FFC and MCF on Gorillas' claim for breach of fiduciary duty. For the same reason, and because there is no evidence whatsoever of reasonable reliance on any alleged misrepresentation, the Court should enter a directed verdict for FFC and MCF on Gorillas' claims for negligent misrepresentation.

**F.      GORILLAS PRESENTED NO EVIDENCE OF EXTORTIONATE OR FRAUDULENT CONDUCT THAT WOULD SUPPORT A VIOLATION OF CHAPTER 93A AS OPPOSED TO MERE BREACH OF CONTRACT OR NEGLIGENT MISREPRESENTATION.**

The Chapter 93A claim is for the judge to decide, though she may allow the jury to find the facts on the claim or render an advisory verdict. *Chamberlayne School v. Banker*, 30 Mass. App. Ct. 346, 354-55 (1991). Gorillas premised its claim under Chapter 93A upon the same facts giving rise to its breach of contract and negligent misrepresentation claims. However, Gorillas presented no evidence from which the jury could find unfair or deceptive conduct going beyond mere breach of contract or negligent misrepresentation (even if the latter claim could be sustained despite the lack of a fiduciary relationship).

15

The "simple fact that a party knowingly breached a contract does not raise the breach to the level of a Chapter 93A violation …." *See Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996), *citing Pepsi-Cola Metro Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985); *Ecological Fibers, Inc. v. Kappa Graphic Board, B.V.*, 345 F. Supp. 2d 13, 15 (D. Mass. 2004) ("[I]n order for a 93A claim to succeed the law requires more than a mistake or honest dispute concerning a contract."). Here, even if Gorillas is able to establish that MCF made ice cream that did not meet the agreed-upon specifications, there is no evidence that it was anything more than an honest mistake caused by allegedly poorly calibrated testing equipment. MCF's production records consistently showed Gorillas' mix to be within specification. (Exhibit 71.) There was no evidence that MCF set out to intentionally mislead Gorillas.

Chapter 93A "proscribes those engaged in trade or commerce from employing '[u]nfair or deceptive methods of competition and unfair or deceptive acts or practices' in business transactions." There are certain cases where facts giving rise to a breach of contract claim will also give rise to a Chapter 93A claim. *See Monotype Imaging*, 883 F. Supp. at 323; citing *Ecological Fibers,* 345 F. Supp. 2d at 15. These are cases where the facts "rise to the level of 'commercial extortion' or a similar degree of culpable conduct." *See Commercial Union*, 217 F.3d at 40, citing *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474-75 (1991) (holding that withholding approval as a pretext to force party into changing price of underlying contract violated Chapter 93A). Thus absent an "extortionate quality," a failure to perform obligations under a contract, "even though deliberate and for reasons of self-interest, does not present an occasion for invocation of ch. 93A remedies." *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992).

In its *Commercial Union* decision, the First Circuit noted some examples of conduct that may support a Chapter 93A violation in a commercial contract context:

> [W]e upheld a finding that a defendant violated 93A by withholding payment and 'stringing out the process' with the intent to 'force [the plaintiff] into an unfavorable settlement." *Arthur D. Little,* [*Inc. v. Dooyang Corp*., 147 F. 3d 47, 55-56 (1st Cir. 1998)]…. Similarly, the Massachusetts Appeals Court upheld a finding of 93A liability for extortionate conduct when a defendant raised 'specious defenses' to payment and engaged in 'foot dragging' and 'a pattern or stringing [the plaintiff] along. *Community Builders, Inc. v. Indian Motorcycle Assocs*., 44 Mass. App. Ct. 537, 692 N.E.2d 964, 978-79 (1998).

217 F.3d at 40; *see also Price Chopper, Inc. v. Consolidated Beverages*, LLC, 2011 WL 901817, *9 (D. Mass. 2011) (stating that violation of Chapter 93A in context of breach of contract "generally involves the use of the breach of contract as a lever or wedge to enhance a party's bargaining power or exact control over the other party," and noting that "[u]nlike the cases where a chapter 93A violation has been found, defendant did not induce plaintiff to perform its part of the contract by making false promises that it would do something in return.").

Gorillas presented no evidence of the type of extortionate conduct that has been found to elevate a breach of contract to a violation of Chapter 93A. *Compare Monotype Imaging,* 883 F. Supp. 2d at 322-23 (allegations that plaintiffs acted in deliberate disregard of their contractual obligations and initiated suit in effort to coerce defendant into entering new licensing agreement insufficient to state a claim under Chapter 93A); *Petersen v. US Airways*, 2013 WL 7196329, *5 (Mass. Super. Nov. 19. 2013). In fact, MCF continued to produce ice cream sandwiches at Gorillas' request, including on October 12, 2015, despite Gorillas being $243,000 behind on payments to MCF. (Trial Tr. 7/31/18, 117:4-18.) MCF also invited Mr. White to come to its facility whenever he wanted, with whomever he wanted, to test the product. (Trial Tr. 8/1/18, 150:17-24.) Mr. White declined that invitation. (*Id.*)

Similarly, a negligent misrepresentation standing alone does not violate Chapter 93A. *See Baker v. Goldman Sachs & Co.*, 2013 WL 4780962, *2 (D. Mass. 2013) (Saris, C.J.) ("The Bakers argue that under Massachusetts caselaw, ordinary negligent misrepresentations violate ch. 93A.

The Bakers are wrong.…the Court has consistently held that 'a negligent act or acts, alone, do not violate c. 93A'"; *citing Klairmont v. Gainsboro, Meyer v. Wagner, Walsh v. Chestnut Hill, O'Connor v. Merrimack*). There "must in addition be evidence that the negligence was or resulted in an unfair or deceptive act or practice." *Squeri v. McCarrick*, 32 Mass. App. Ct. 203, 207 (1992); *see also Poly v. Moylan*, 423 Mass. 141, 151 (1996), *cert. denied*, 519 U.S. 1114, 117 S.Ct. 956, 136 L.Ed.2d 843 (1997). Some decisions have required the conduct to be "extreme or egregious" to rise to the level of a Chapter 93A violation. *Marram v. Kobrick Offshore Fund*, *Ltd.*, 442 Mass. 43, 62 (2004) ("Because a misrepresentation may be so extreme or egregious as to constitute a violation of G.L. c. 93A, § 11 … the G.L. c. 93A claim for preinvestment statements must be reinstated."); *Lily Transp. Corp. v. Royal Institutional Services, Inc.*, 64 Mass. App. Ct. 179, 208 (2005) (Laurence, J. dissenting) ("A negligent act can amount to a c. 93A violation if shown to have been separately deceptive … although to constitute a c. 93A violation under § 11, it would have to be 'extreme or egregious,'" *citing Marram v. Kobrick*).

As with the breach of contract claim, Gorillas did not present evidence of egregious conduct which would elevate its negligent misrepresentation claim (even if it were viable) to a violation of Chapter 93A. In fact, it was clear from the evidence presented that any alleged failure to disclose information to Gorillas was immaterial. On September 1, 2015, Chris White wrote an e-mail to Jack Lockwood, Ken Johnson and Mahesh Khemraj, saying: "Regardless of the test results that you have attained or are waiting on, we have a very serious issue with our product that needs to be addressed." (Exhibit 218.) And Mr. White had already concluded in May 2015 that his quality concerns were caused by the ice cream that MCF was producing. (Trial Tr. 7/30/18, 114:20-115:3.) Thus, any alleged failure of MCF to communicate test results to Gorillas cannot form the basis of a claim that Gorillas was deceived. Any failure of MCF to communicate alleged problems

with its Lactoscope to Gorillas is similarly immaterial, as Gorillas performed extensive outside testing on the mix manufactured by MCF, and thus had no reason to rely on the Lactoscope if it found the outside results more creditable.

Gorillas did not present evidence of any extortionate conduct elevating its claim beyond mere breach of contract, or any fraudulent conduct elevating it beyond negligent misrepresentation. All of its other claims flow from the contract and the alleged misrepresentations. As such, there is no evidentiary basis to find a violation of Chapter 93A, and the Court should enter judgment for FFC and MCF on this claim.

**G.      GORILLAS HAS NOT ESTABLISHED FACTS SUPPORTING PIERCING THE CORPORATE VEIL, AS THERE IS NO PERVASIVE CONTROL OF MCF BY FFC, NO FRAUDULENT OR INJURIOUS CONSEQUENCE THEREOF, AND NO CONFUSED INTERMINGLING OF CORPORATE ACTIVITY.**

Under certain limited circumstances, a corporation may become liable for the acts of its subsidiary in what is known as piercing the corporate veil. In Massachusetts, this doctrine may be applied: "(a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618, 233 N.E.2d 748 (1968). The courts have also developed a twelve-part test for piercing the corporate veil, as further described below. "One way to view the relationship between the two categorical requirements and the twelve-part test is that in order to permit a piercing of the corporate veil, the court must review the evidence to determine whether either of the two categorical requirements

19

has been met, and in doing so, the court should consider the factors set forth in the twelve-part test." 48 Mass. Prac. Collection Law § 12:7 (4th ed.), *citing Hiller Cranberry Products, Inc. v. Koplovsky Foods, Inc.*, 2 F. Supp. 2d 157 (D. Mass. 1998), *aff'd in part, rev'd in part on other grounds*, 165 F.3d 1 (1st Cir. 1999).

The twelve-part test involve an examination of the following factors: (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate funds by dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of dominant shareholders; and (12) use of the corporation in promoting fraud. *Zimmerman v. Puccio*, 613 F.3d 60 (1st Cir. 2010).

"In order to pierce the corporate veil, a court must conclude after evaluating these factors that the parent corporation directed and controlled the subsidiary and used it for an improper purpose." *TechTarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353, 356 (D. Mass. 2010). Piercing the corporate veil requires Gorillas to meet a "very high" standard, as "disregarding separate corporate entities is the exception, not the rule." *Dale v. H.B. Smith Co.*, Inc., 910 F.Supp. 14, 18 (D.Mass. 1995). Put another way, "the corporate veil may be pierced only with reluctance and in extreme circumstances when compelled by reasons of equity." *Lothrop v. N. Am. Air Charter, Inc.*, 95 F. Supp. 3d 90, 100 (D. Mass. 2015). Thus Gorillas must prove, under the above twelve factor analysis, that piercing the corporate veil is required in order to prevent "gross inequity." *Id.*, 103 (D. Mass. 2015). Gorillas did not present evidence at trial to support such a finding.

Gorillas presented almost no evidence bearing on the above factors. Gorillas established that MCF is wholly owned by FFC. (Trial Tr. 8/8/18, 6:12-17.) But there was no evidence of intermingling of assets, thin capitalization, nonobservance of corporate formalities, absence of corporate records, or the other elements of the veil-piercing test. On the contrary, there was affirmative evidence that MCF leases its own building, owns all of its equipment, employs its own personnel, maintains separate financial records, makes its own corporate and tax filings, and is solvent. (Trial Tr. 8/8/18, 29:20-32:24.)

Regarding the element of pervasive control, there was some evidence that FFC and MCF shared certain operational functions. For example, FFC performed certain accounting, financial and administrative functions for MCF. (Trial Tr. 8/8/18, 33:7-36:9.) Some of the communications related to resolving Gorillas' quality complaints were undertaken by FFC personnel despite the contract having been between Gorillas and MCF. (*See, e.g.*, Exhibit 23, 83.) And FFC sent invoices to Gorillas for services provided by MCF, though they indicated that payment thereunder should be made to MCF. (Exhibit 179.) However these limited actions undertaken by FFC on behalf of MCF are not sufficient to establish FFC's "pervasive control" over MCF. Pervasive control means intrusive, "overwhelming control over [the other company's] financial and operational structure" and "precluding [the other company's] executives from significant daily decision-making." *United States v. Kayser-Roth Corp.*, 272 F.3d 89, 93 (1st Cir. 2001); *UST Corp. v. General Road Trucking Corp.*, 783 A.2d 931, 940 (R.I. 2001) (parent should be held liable when it dominates the finances, policies, and practices of the subsidiary); *see also* William J. Rands, Domination of a Subsidiary by a Parent, 32 Ind. L. Rev. 421 (1999) (pervasive control "usually means intrusive, hands-on, day-to-day control with the parent often leaving no discretion whatsoever to the subsidiary.")

FFC's handling of certain communications with Gorillas, and sending invoices on MCF's behalf, does not rise to the level of pervasive control. *See Velazquez v. P.D.I. Enterprises, Inc.*, 141 F. Supp. 2d 189, 194 (D.P.R. 1999) (no veil piercing, despite subsidiary selling merchandise owned by parent and collecting payment therefor). Additionally, control alone is not a sufficient basis to support veil piercing. Rather, pervasive control must be accompanied by fraudulent or injurious consequence in order to provide a basis for veil-piercing. *Hiller*, 2 F. Supp. 157. Nothing about FFC's communications on MCF's behalf raises the specter of any fraudulent or injurious consequence that Gorillas would not have suffered from the same conduct being undertaken by MCF directly. *See Lothrop*, 95 F. Supp. 3d at 101 (fraudulent or injurious consequences must "stem from the relationship between the corporations").

Gorillas did not present evidence that would permit a reasonable jury to conclude either (a) that FFC exercised pervasive control of MCF in a way that caused fraudulent or injurious consequences to Gorillas, or (b) that there was a confused intermingling of corporate activity between FFC and MCF.  *My Bread Baking*, 353 Mass. at 618. On the contrary, the evidence showed that beyond certain limited shared functions, the companies are legally and operationally separate. Therefore the Court should direct a verdict in favor of FFC and MCF to the extent that Gorillas seeks to hold either liable for the actions of the other.

## Conclusion

WHEREFORE, the Defendants respectfully request that this Court grant judgment in their favor, and award the Defendants such other relief as this Court deems proper.

Respectfully submitted,

FIELDBROOK FOODS CORP. and
MISTER COOKIE FACE, LLC

By their Attorneys,

 /s/ Blake T. Hannafan
Blake T. Hannafan (admitted pro hac vice)
HANNAFAN & HANNAFAN, LTD.
One East Wacker Drive, Suite 2800
Chicago, IL  60601
312-527-0055
bth@hannafanlaw.com
jam@hannafanlaw.com

Frank N. Gaeta (BBO #561388)
RICH MAY, P.C.
176 Federal Street
Boston, MA  02110
617-556-3800
fgaeta@richmaylaw.com

Dated: August 13, 2018

## **CERTIFICATE OF SERVICE**

      I hereby certify that I caused a true copy of the above document to be served on the Plaintiff by hand-delivery to its counsel of record on August 13, 2018, and that the document will be filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on August 13, 2018.

                    /s/ David Glod
                    David Glod