UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| 600 LB GORILLAS, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No. 15-cv-13991-ADB |
| FIELDBROOK FOODS CORP. and MISTER | * |
| COOKIE FACE, LLC, | * |
| | * |
| Defendants. | * |
| | * |

# MEMORANDUM AND ORDER
## CONCERNING THE PARTIES' CHAPTER 93A CLAIMS

BURROUGHS, D.J.

Plaintiff 600 lb Gorillas, Inc. ("Gorillas") brought this lawsuit against Defendants Fieldbrook Foods Corp. ("Fieldbrook") and Mister Cookie Face, LLC ("MCF"), alleging that Defendants failed to manufacture ice cream for Gorilla's ice cream sandwiches consistent with the parties' agreed-upon specifications. On August 17, 2018, at the conclusion of a fourteen-day jury trial, the jury returned a verdict finding that MCF breached the parties' contract and that MCF and Fieldbrook breached the covenant of good faith and fair dealing and were liable for negligent misrepresentation. [ECF No. 294]. In addition, the jury determined that Gorillas also breached the contract and that MCF was entitled to recover from Gorillas based on quantum meruit. Id. The jury awarded Gorillas a total of $725,000 in damages, while also determining that MCF was entitled to $270,785.37 in damages. Id. The jury rendered an advisory verdict on both parties' claims pursuant to Mass. Gen. Laws ch. 93A, finding that neither Gorillas nor MCF had proven that the other party committed an unfair or deceptive act or trade practice. Id. The Court hereby adopts the advisory verdict as its own, and accordingly, enters the following findings of

fact and conclusions of law concerning the Chapter 93A claims.

I.  **FINDINGS OF FACT**

The Court makes the following findings of fact, consistent with the jury verdict.[1] Gorillas was founded in 1999 by the husband and wife team of Paula and Chris White. Paula White served as Gorillas' Chief Executive Officer, and Chris White was Gorillas' Chief Operating Officer and Production Manager. Gorillas was in the business of selling ready-to-bake cookie dough and ice cream sandwiches. It sold ice cream sandwiches from 2008 through July 2016. Gorillas' product was sold throughout the United States by major retail chains such as BJ's, Walmart, and Costco, as well as in supermarkets throughout the country. Gorillas originally contracted with Rhino Foods, based in Vermont, to manufacture the ice cream for its ice cream sandwiches. Rhino Foods used a mix produced by United Dairy, Inc.

On March 25, 2011, Gorillas moved the production of its ice cream sandwiches to MCF. MCF produced Gorillas' product at its Lakewood, New Jersey facility. MCF acquired all the ingredients for the ice cream sandwiches, purchased packaging materials, and manufactured, assembled, and packaged the product. At all relevant times, the cookies used in the production of Gorillas' ice cream sandwiches were baked and supplied by Ellison Bakery.

On or about May 31, 2011, Fieldbrook purchased substantially all of MCF's assets. After Fieldbrook purchased MCF, Gorillas began to receive invoices from Fieldbrook, and when Gorillas needed to discuss problems with the product, it communicated with individuals who identified themselves as executives of Fieldbrook and who referenced Gorillas' relationship with Fieldbrook, not MCF.

---

[1] The Court is aware that it can make factual findings independent of those apparently found by the jury, see Baker v. Goldman Sachs & Co., 949 F. Supp. 2d 298, 307–08 (D. Mass. 2013) (citing cases), but declines to do so in this case.

2

At the beginning of their relationship, MCF used the ice cream mix produced by United Dairy. Later, MCF and Gorillas orally agreed that MCF would manufacture ice cream in-house to specifications of 14% butterfat with a variance of not less than 0.5% and solids of 36.80%. Before agreeing to switch to the in-house mix, Mr. White had a conversation with Tony Papalia, MCF's general manager, in which Mr. White emphasized the importance of replicating the United Dairy mix exactly, and Mr. Papalia promised there would be no difference. After MCF began to manufacture the ice cream, however, the company made changes to the formulation, including using milk powder instead of liquid milk and adding water.

After switching the production of ice cream to MCF, Gorillas began to receive complaints from customers that the ice cream in the sandwiches tasted "watery" and "icy." Eventually, Gorillas sent samples of the ice cream to outside laboratories, including UL Laboratories and Deibel Laboratories, for testing. The results from most of the tests indicated that the ice cream was not being produced to specification, with many tests showing that the ice cream had significantly less butterfat and solids than agreed. MCF and Fieldbrook's internal test results also indicated that the ice cream was not within specification at least some of the time. In addition, Plaintiff introduced evidence demonstrating that MCF used a piece of equipment known as a lactoscope for testing, but that the model of lactoscope that they used was not the correct device for testing ice cream; instead, it was designed to be used to test milk and fluid milk products. Dr. Rankin testified that the lactoscope was not calibrated correctly, and that MCF and Fieldbrook were not using the proper channel. He also testified that MCF and Fieldbrook did not appear to have any standard operating procedures as to the operation, maintenance, or calibration of the lactoscope. Furthermore, MCF and Fieldbrook sent a sample to an outside laboratory, Silliker Labs, for testing, the results of which also indicated that the ice

cream was not within specification.

When the Whites contacted MCF and Fieldbrook about the problems with the ice cream quality, MCF and Fieldbrook were not able to remedy the issue. Instead, MCF and Fieldbrook pointed to other possible factors that could be causing the quality issues, including temperature abuse or heat shock—essentially, that the sandwiches were stored at an improper temperature and the ice cream melted and then froze again. Mr. Khemraj conceded, however, that MCF and Fieldbrook had no evidence to indicate that temperature abuse or heat shock had occurred with Gorillas' product. MCF and Fieldbrook also told the Whites that the quality issues were being caused by the cookie produced by Ellison Bakery.

Seven to eight months after the Silliker Labs testing showed that the ice cream was not being produced to specification, Ken Johnson, the CEO of Fieldbrook, told Mr. White that he was not aware of any quality issues with the ice cream. Meanwhile, however, internal company emails indicate that MCF and Fieldbrook knew that there might be problems with the ice cream. Jack Lockwood, Fieldbrook's director of quality, sent an email to MCF's quality assurance manager, Jonathan Schmitt, in which he stated his belief that there may be "mix testing inaccuracies" with the lactoscope used at the MCF factory. Schmitt replied, "Yes, I agree. It's sad that no one can tell me the last time it was calibrated by an outside contractor/manufacturer." Mr. Lockwood also emailed Mr. Khemraj to report the results of a test showing that the ice cream was out of specification. Later, Mr. White emailed Mr. Lockwood with the test results from UL Laboratories, and requested that they speak on the phone. Mr. Lockwood delayed responding to Mr. White, before writing that MCF was comparing internal test results and awaiting the results of that comparison. The same day, however, Mr. Lockwood wrote to Mr. Khemraj with test results indicating the ice cream was not within specification.

A few weeks later, Mr. Khemraj emailed test results from Silliker Labs to Mr. Lockwood which showed the ice cream did not meet the specifications. The next day, however, Mr. Khemraj sent an email to Mr. White stating that the lab was not able to test the sample that was sent, and that MCF would send another sample soon. Meanwhile, Mr. Khemraj instructed MCF employees not to share any information with Mr. White without prior approval. Later, Mr. Lockwood emailed Ken Johnson, the COO of Fieldbrook, that "MCF mix testing equipment is not correctly calibrated contributing to this issue." A month later, Mr. Lockwood emailed Mr. Johnson concerning updating the testing equipment at the MCF facility. Mr. Lockwood wrote that the update would help to "avoid issues similar to Gorilla[s]" and would likely help avoid future issues. He also stated that he believed their "unreliable equipment" contributed to "mix concerns," because the equipment was designed for testing milk, not ice cream.

MCF and Fieldbrook introduced evidence that, during the time in question, Gorillas was also having some problems with the cookie produced by Ellison Bakery. Gorillas had concerns about the cookie having a grainy taste or texture, an unappealing appearance, and that it was too hard.

During the last few months that Gorillas sold its ice cream sandwiches, it placed orders with MCF, and received and sold the product. Gorillas did not pay MCF or Fieldbrook for the fifteen invoices that MCF sent Gorillas in August, September, and October 2015, which totaled $270,785.37.

## II. DISCUSSION

"Under Chapter 93A, an act or practice is unfair if it falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness;' 'is immoral, unethical, oppressive, or unscrupulous;' and 'causes substantial injury to consumers'" or competitors or

other businesspeople. Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016) (quoting PMP Assocs. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)). "To rise to the level of an 'unfair' act or practice, the defendant's conduct must generally be of an egregious, non-negligent nature." Id. (citing Baker v. Goldman, Sachs & Co., 771 F.3d 37, 51 (1st Cir. 2014)). An act or practice is deceptive "'if it possesses a tendency to deceive' and 'if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'" Id. (quoting Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d 476, 486–87 (Mass. 2004).

"[A] breach of contract alone does not amount to an unfair act or practice" under Chapter 93A. Massachusetts Emp'rs Ins. Exch. v. Propac-Mass, Inc., 648 N.E.2d 435, 438 (Mass. 1995). A breach of contract can only violate Chapter 93A if it "rises to the level of 'commercial extortion' or a similar degree of culpable conduct." Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000) (quoting Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (Mass. 1991)).

A.     **Gorillas' Chapter 93A Claim**

Gorillas' Chapter 93A claim is premised on the contention that MCF and Fieldbrook engaged in an unfair or deceptive act or practice because they knew that the ice cream did not satisfy the specifications, and knew that their testing equipment was inadequate, but nevertheless attempted to cast the blame elsewhere, by asserting that any quality issues were caused by temperature abuse, heat shock, or the cookie manufactured by Ellison Bakery.

Gorillas failed to demonstrate that MCF and Fieldbrook's actions were sufficiently unfair, immoral, unethical, oppressive, or unscrupulous to constitute a violation of Chapter 93A. Instead, the evidence presented by Gorillas shows that MCF and Fieldbrook simply breached the

contract and that damages resulted. As an initial matter, although Gorillas was apparently operating on the belief that there was a major defect with the product, it is not clear that MCF or Fieldbrook shared this belief. The evidence indicated that MCF and Fieldbrook were aware that the ice cream might not have consistently met specifications, and that the lactoscope might have been generating unreliable test results. Further, MCF and Fieldbrook were not forthcoming with this information. Chapter 93A, however, does not obligate MCF and Fieldbrook to divulge all of their internal discussions and testing, particularly where the test results were inconsistent and where Gorillas had also acknowledged having some quality issues with the cookie. The suggestion by MCF and Fieldbrook that temperature abuse or heat shock might be partly responsible for the quality issues was also not unreasonable. Moreover, MCF and Fieldbrook allowed Mr. White to visit the factory to observe the manufacturing process, and he was able to have the ice cream tested by outside laboratories, so it is not clear that any dissembling or deflection by MCF or Fieldbrook kept Gorillas in the dark or induced Gorillas to act differently than it otherwise would have. Ultimately, while MCF and Fieldbrook's behavior may not have been admirable at all times, it did not rise to the level of a Chapter 93A violation.

### B. MCF's Chapter 93A Counterclaim

The basis of MCF's Chapter 93A counterclaim against Gorillas is not immediately apparent. MCF's claims were all focused on the breach of contract that occurred where Gorillas placed multiple orders in August, September, and October of 2015, but never paid for those orders, even though Gorillas later sold that product. Gorillas conceded that it did not pay invoices from that time period totaling $270,785.37, but MCF did not introduce any additional evidence pertaining to the failure to pay those invoices to support its 93A claim. There is no evidence to suggest that Gorillas' failure to pay the invoices was unfair or extortionate in any

7

way. Rather, the evidence indicates that it was simply a breach of contract. As such, MCF cannot prevail on its Chapter 93A claim.

## III. CONCLUSION

Based on the above Findings of Fact and Conclusions of Law, this Court <u>ORDERS</u> that judgment enter in favor of MCF on Gorillas' Chapter 93A claim, and that judgment enter in favor of Gorillas on MCF's Chapter 93A counterclaim.

**SO ORDERED.**

September 6, 2018 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE